Kristin V. Gallagher, Esq.
Joshua C. Weisberg, Esq.
**CARROLL McNULTY & KULL LLC**
120 MOUNTAIN VIEW BOULEVARD
P.O. BOX 650
BASKING RIDGE, NEW JERSEY 07920
908-848-6300
908-848-6310
Attorneys for Defendant
Citizens Ins. Co. of America

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.C., | ) |
| | ) |
| Plaintiff, | ) **13-cv-07153-MAS-TJB** |
| | ) |
| v. | ) |
| | ) |
| CITIZENS INSURANCE COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**PURSUANT TO L. CIV. R. 56.1, DEFENDANT CITIZENS INSURANCE COMPANY OF AMERICA'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

### A. Lotito Secretly Videotapes The Claimant While Engaged In Sexual Intercourse

1. This matter arises out of alleged damages sustained by "J.C."[1] (the "Claimant") as a result of certain events that took place on or about November 30, 2009. (See, May 9, 2014 Declaration of Kristin V. Gallagher ("Gallagher Dec."), Ex. A, February 23, 2011 Complaint filed by J.C. in the Superior Court of New Jersey, Monmouth County.)

2. On or about November 30, 2009, the Claimant went to visit Lotito at his house and they engaged in sexual intercourse. (Gallagher Dec., Ex. B, December 10, 2009 Voluntary Victim Statement Transcript of J.C.)

3. Lotito intentionally, "viciously" and secretly videotaped their sexual encounter. (Gallagher Dec., Ex. A and Ex. C, Uniform Answers to Interrogatories certified by J.C., Answers 2, 19, and 20.)

4. Prior to videotaping the Claimant, Lotito ran upstairs to turn on the video camera without the Claimant present, prepared the room he used for his criminal act by setting up a candle, cleaned the room and made his bed. (Gallagher Dec., Ex. B and Ex. E., Middletown Township Police Investigation Report dated December 18, 2009.)

5. During the encounter, Lotito repeatedly positioned the Claimant in a single spot on the bed and, several times, removed the Claimant's blanket – even though she stated she was cold. (Gallagher Dec., Exs. B and E.)

6. At some point, the Claimant noticed Lotito's video camera, which was usually on Lotito's night stand, was now positioned on his dresser. (Gallagher Dec., Exs. B and E.)

7. The Claimant noticed a "humming noise" coming from the camera. (Gallagher Dec., Exs. B and E.)

8. The Claimant asked Lotito what the humming noise was and he replied that it was coming from his computer in the next room. (Gallagher Dec., Exs. B and E.)

---

[1] Due to the extremely sensitive and sexualized nature of the incidents at issue in this case, the parties have agreed to withhold the Claimant's full name from the Court record.

9. Lotito tried to distract the Claimant by loudly talking. (Gallagher Dec., Exs. B and E.)

10. Lotito was nervous. (Gallagher Dec., Exs. B and E.)

11. At some point, Lotito began posing and acting. (Gallagher Dec., Exs. B and E.)

12. The Claimant confronted Lotito and asked him if he was videotaping them. Lotito denied the accusation and countered that the Claimant should have trusted him. (Gallagher Dec., Exs. B and E.)

13. The Claimant then demanded to see the camera when Lotito claimed the battery was not even attached and he tried to rewind the tape so the Claimant could not see certain footage. (Gallagher Dec., Exs. B and E.)

14. At that point, the Claimant saw Lotito was lying; he had videotaped the Claimant's intimate parts without her knowledge or consent. (Gallagher Dec., Exs. B and E.)

15. Lotito then stated he did not mean to hurt the Claimant. He stated that he did not ask her for permission, however, because he knew she would refuse consent. (Gallagher Dec., Exs. B and E.)

16. The Claimant has stated that she never discussed videotaping herself during sex with Lotito at any point prior to the November 30, 2009 incident. (Gallagher Dec., Exs. B and E.)

17. On December 1, 2009, the Claimant returned to Lotito's home and demanded the videotape. Lotito initially refused to give her the video for about 25 minutes, but finally relented. (Gallagher Dec., Ex. B.)

## B. The Claimant's Criminal Complaint and Lotito's Plea

18. The Claimant subsequently filed criminal charges against Lotito. (Gallagher Dec., Ex. D.)

19. Lotito appeared for an interview with the Middletown Township Police Department on December 18, 2009, in connection with the Claimant's criminal complaint. (Gallagher Dec. Ex. E.)

20. During his interview with the police, Lotito admitted he had set up a camera to videotape the Claimant, stated they had discussed videotaping themselves beforehand, and stated that the Claimant "sort of" previously agreed to videotaping a sexual encounter, but she "wasn't sure" she wanted to. (Gallagher Dec., Exs. E and F, Certified Transcript of Videotaped Confession of Joseph Lotito.)

21. Lotito also initially told the police that he had never videotaped the Claimant while having sex because the battery in the camera was not working. (Gallagher Dec., Exs. E and F.)

22. When confronted by the police with evidence that they possessed the videotape, given to them by the Claimant, Lotito admitted he was lying and that he had videotaped the Claimant "a little bit." (Gallagher Dec., Exs. E and F.)

23. On May 7, 2010, Joseph pled guilty to felony, criminal invasion of the Claimant's privacy in the third degree, a crime that carries with it a potential incarceration period of 2.5 to 5 years. (Gallagher Dec., Ex. D.)

24. During his plea allocution, Lotito admitted he videotaped the Claimant and that the Claimant had not given him license or privilege to do so. (Gallagher Dec., Ex. D.)

25. During his plea allocution, Lotito admitted he was pleading guilty to criminal invasion of privacy in the third degree because he was, in fact, guilty. (Gallagher Dec., Ex. D.)

26. A perpetrator commits criminal invasion of privacy in the third degree under Title 2C: 14-9 of the New Jersey Criminal Code if, *knowing that he is not licensed or privileged to do so*, he videotapes the image of another person whose intimate parts are exposed or who is engaged in an act of sexual penetration or sexual contact, without that person's consent and under circumstances in which a reasonable person would not expect to be observed.

27. The Claimant stated to police that she felt "emotionally raped" by Lotito's secret videotaping of their sexual intercourse. (Gallagher Dec., Ex. B.)

## C. The Underlying Civil Lawsuit

28. On February 23, 2011, the Claimant commenced a civil action against Lotito, Anthony Lotito, and Claudia Lotito in the Superior Court of New Jersey, Monmouth County (Docket No. L-997-11) (the "Underlying Action"). (Gallagher Dec., Ex. A.)

29. According to the underlying complaint, Lotito "viciously" videotaped the Claimant's intimate parts without authorization. The Claimant alleged she has suffered and will continue to suffer from emotional distress, stomach distress and difficulty sleeping as a result of Lotito's actions. (Gallagher Dec., Exs. A and C.)

30. The Claimant treats for her alleged conditions with a social worker, Neil Glassman. (Gallagher Dec., Ex. C.)

31. The Claimant has never sought treatment from a licensed medical professional for any of the alleged effects she suffered as a result of the November 30, 2009 incident.

## D. The Citizens Policy

32. Citizens issued a Homeowners insurance policy to Anthony Lotito under policy number HPY 5118877 for the period of April 30, 2009 to April 30, 2010 with liability limits of $300,000 per "occurrence." (the "Citizens Policy") (See, Gallagher Dec., Ex. G.)

33. The Citizens Policy lists Anthony Lotito as the named insured with the insured location further listed as 198 Cherry Tree Lane, Middletown, New Jersey. (Gallagher Dec., Ex. G.)

34. Section II – Liability Coverage to the Citizens Policy contains the following relevant Insuring Agreement:

> Coverage E – Personal Liability
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

      1.    Pay up to our limit of liability for the damages for which the "insured" is legally liable…

(Gallagher Dec., Ex. G.)

35. Section II – Exclusions contains the following relevant limitations on Personal Liability coverage:

      1.    Coverage E – Personal Liability and Coverage F – Medical Payments to Others do not apply to "bodily injury":

          a.    With respect to all "insureds" which is expected or intended by one or more "insureds" even if the "bodily injury" or "property damage":

              (1)    Is of a different kind, quality or degree than expected or intended; or

              (2)    Is sustained by a different person or entity than expected or intended.

          k.    Arising out of sexual molestation, corporal punishment or physical or mental abuse.

(Gallagher Dec., Ex. G.)

36. Endorsement No. 231-1480 amended the definition of "bodily injury" for Coverage E – Personal Liability to include "personal injury." "Personal Injury" is in turn defined, in relevant part, as follows:

"Personal injury" means injury arising out of one or more of the following offenses:

          3.    Invasion of privacy, wrongful eviction or wrongful entry.

(Gallagher Dec., Ex. G.)

37. Endorsement No. 231-1480 contains the following relevant exclusion for "personal injury:"

> "Personal injury" insurance does not apply to:
>
> 2. Injury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of an "insured."
>
> (Gallagher Dec., Ex. G.)

38. Finally, the Citizens Policy contains the following relevant definitions:

> "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in:
>
> "bodily injury" means bodily harm, sickness, or disease, including required care, loss of services and death that results.
>
> (Gallagher Dec., Ex. G.)

### E. The Citizens Tender

39. By correspondence dated October 24, 2012, the Lotitos' counsel (Shebell and Shebell LLC) provided Citizens with notice of the Underlying Action. (Gallagher Dec., Ex. H.)

40. The Lotitos' counsel stated that coverage was available to his clients for the Underlying Action under a Homeowners insurance policy issued to Anthony Lotito under policy number HPY 5118877, i.e. the "Citizens Policy." (Gallagher Dec., Ex. H.)

41. By correspondence to the Lotitos' counsel dated December 10, 2012, Citizens disclaimed coverage for the claims asserted in the Underlying Action. Citizens specifically stated that the Claimant did not allege injury stemming from an "occurrence" as Lotito admitted he did not have the Claimant's consent to film her. Citizens also stated that exclusion 1.a., to the Citizens Policy bared

coverage for any bodily injury or property damage "expected or intended" by "one or more insureds." As Lotito already admitted that he intentionally videotaped the Claimant and knew she would not consent if she knew about the filming, Citizens maintained that exclusion 1.a applied. (Gallagher Dec., Ex. I.)

42. Citizens further disclaimed because the Claimant did not allege "bodily injury" within the meaning of the Policy as her only claimed injuries in the complaint were for mental distress and invasion of privacy. Citizens also stated that even if the Claimant alleged "bodily injury," exclusion "k" for sexual molestation or mental abuse barred coverage. Further, exclusion "2" for "Personal Injury . . . caused by a violation of a penal law or ordinance committed by or with knowledge or consent of an insured" applied because Lotito's actions constituted a violation of the New Jersey Criminal Code and Lotito had, in fact, pled guilty to felony invasion of the Claimant's privacy. (Gallagher Dec., Ex. I.)

43. By further correspondence dated December 31, 2012, Citizens reiterated its declination of coverage to the Lotitos' counsel. (Gallagher Dec., Ex. J.)

E. The Consent Judgment and DJ Action

44. The Lotitos and the Claimant subsequently entered into a Consent Judgment on or about March 6, 2013, which included a dismissal of all claims against the Lotitos in the Underlying Action. (Gallagher Dec., Ex. K.)

45. In the Consent Judgment, Joseph Lotito assigned all rights against Citizens to the Claimant in the amount of $200,000. (Gallagher Dec., Ex. K.)

46. The Claimant then filed a declaratory judgment complaint against Citizens in Monmouth County Superior Court, Law Division (Case No. L-4031-13) on October 16, 2013. (the "DJ Action"). In the DJ Action, the Claimant alleges that Citizens wrongfully refused to defend Lotito in the Underlying Action. The Claimant seeks the full amount of the Consent Judgment, attorneys' fees incurred by Lotito in the Underlying Action and the Claimant's attorneys' fees incurred in prosecuting the DJ Action. (Gallagher Dec., Ex. L.)

47. On November 25, 2013, Citizens removed the DJ Action to the United States District Court for the District of New Jersey.

48. On December 16, 2013, Citizens answered the DJ Action complaint, denying any obligation to indemnify Lotito or the Claimant for any of the alleged damages at issue in the Underlying Action.

        CARROLL, MCNULTY & KULL LLC
        Attorneys for Defendant,
        Citizens Insurance Company of America

        s/
        Kristin Gallagher
        Joshua C. Weisberg

DATED: May 9, 2014